UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION-SINGLE SPORT/SINGLE SCHOOL (FOOTBALL) | MDL No. 2492<br><br>Case No. 16 CV 8727<br><br>16 CV 7320 (Hermann)<br>16 CV 7323 (Miller)<br>16 CV 7324 (Owens)<br>16 CV 9971 (Davison)<br>16 CV 9974 (Ford)<br>16 CV 9992 (Bozeman)<br>17 CV 3960 (Williams)<br>17 CV 7554 (Calleja)<br><br>Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are former college football players who have sued the Southeastern Conference based on theories of negligence, fraudulent concealment, breach of contract, and unjust enrichment, all arising out of the conference's alleged failure to adopt and implement adequate concussion treatment, concussion management safety protocols, and return-to-play guidelines.

Judge Lee previously dismissed all claims brought by sample-case plaintiff Jamie Richardson against the SEC because the conference was not subject to personal jurisdiction in Indiana. *Richardson v. Se. Conference*, 612 F.Supp.3d 753 (N.D. Ill. 2020). Without opposition from Richardson, Judge Lee entered final judgment

pursuant to Federal Rule of Civil Procedure 54(b). *Richardson*, 16-cv-9980, [98]–[100].[1] Richardson did not appeal.

The SEC now moves to dismiss eight additional cases for lack of personal jurisdiction under Rule 12(b)(2) and to enter final judgment dismissing the SEC from each case under Rule 54(b). The SEC argues that four of the eight cases have fact patterns identical to *Richardson* and the other four have minor factual differences from *Richardson* that do not affect the jurisdictional analysis. [431] at 8–9. I agree with the SEC and with Judge Lee's analysis in *Richardson*. For the reasons set forth below, the SEC's motion is granted.

I.  **Background**

Plaintiffs all played football at SEC member institutions.[2] *Bozeman*, [1] ¶ 77 (University of Mississippi from 2001–2005); *Davison*, [1] ¶ 78 (Mississippi State from 1974–1978); *Ford*, [1] ¶ 77 (University of Kentucky from 2005–2009); *Hermann*, [1] ¶ 77 (University of Georgia from 1984–1986); *Miller*, [1] ¶ 76 (Auburn University from 1996–1998); *Owens*, [1] ¶ 78 (University of Tennessee from 2000–2003); *Calleja*, [1] ¶ 24 (Auburn University from 1971–1973); *Williams*, [1] ¶ 24 (University of Alabama from 1999–2004).

---

[1] Bracketed numbers without reference to a specific plaintiff refer to entries on the district court master docket, No. 16-CV-8727. Bracketed numbers with reference to a specific plaintiff refer to entries on the district court docket in that plaintiff's case. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

[2] The facts are taken from the eight plaintiffs' complaints and the declaration of Mark Womack, [431-1], attached to the SEC's motion to dismiss, [431]. Where plaintiffs have made identical allegations, I cite to one of the complaints as an example.

2

During practices and games, plaintiffs all suffered repetitive concussive and subconcussive hits. *Bozeman*, [1] ¶¶ 78, 80. Plaintiffs allege that during their time as student-athletes, the SEC failed to put in place adequate concussion treatment, concussion management safety protocols, and return-to-play guidelines. *Bozeman*, [1] ¶¶ 79–80. Plaintiffs were quickly put back into games and practices or were dismissed to recuperate on their own without medical care despite their injuries. *Bozeman*, [1] ¶ 81. Plaintiffs allege that the SEC knew at the time that such treatment, protocols, and guidelines were necessary to monitor, manage, and mitigate the risks associated with head injuries. *Bozeman*, [1] ¶ 82. At least one plaintiff ultimately stopped playing football because of the repeated concussions he sustained. *Ford*, [1] ¶ 83. As a result, plaintiffs now suffer from severe daily headaches, memory loss, dizziness, and other debilitating symptoms. *Bozeman*, [1] ¶ 83.

The SEC consists of fourteen member institutions located in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, South Carolina, Tennessee, and Texas.[3] *Bozeman*, [1] ¶ 17. The SEC is one of the most financially successful and most victorious conferences in history—in 2015 alone, the SEC distributed $455 million to its member schools. *Bozeman*, [1] ¶ 17; *cf. Calleja*, [1] ¶ 17 (alleging the SEC has collected over $2.6 billion in revenue since it was

---

[3] The SEC's fourteen member institutions are: Auburn University, Louisiana State University, Mississippi State University, Texas A&M University, University of Alabama, University of Arkansas, University of Florida, University of Georgia, University of Kentucky, University of Mississippi, University of Missouri, University of South Carolina, University of Tennessee, and Vanderbilt University. [431-1] ¶ 6.

3

formed). Together with the National Collegiate Athletic Association, the SEC regulates member schools' football programs. *Bozeman*, [1] ¶ 19.

The SEC is required to abide by the NCAA Constitution, which states that their primary principle is to ensure that "[i]ntercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes." *Bozeman*, [1] ¶¶ 24–25. To accomplish this purpose, the NCAA has promulgated and implemented certain regulations and requirements for its sports, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, which provide detailed instructions on game and practice rules pertaining to player well-being and safety. *Bozeman*, [1] ¶ 25. The NCAA also publishes a Sports Medicine Handbook, which it updates every year. *Bozeman*, [1] ¶ 26. The Handbook includes official policies for the treatment and prevention of sport-related injuries, as well as return-to-play guidelines. *Bozeman*, [1] ¶ 26.

Concussions result from an impact that causes the brain to move around in the skull, damaging the brain. *Bozeman*, [1] ¶ 34. Concussions cause a variety of symptoms that may prevent concussed people from recognizing that they have suffered a concussion. *Bozeman*, [1] ¶¶ 38–39. After a concussion, the brain needs time, potentially up to two weeks, to heal to prevent further injury. *Bozeman*, [1] ¶¶ 40–41. Individuals who continue to experience concussion symptoms beyond a few weeks are diagnosed with post-concussion syndrome. *Bozeman*, [1] ¶ 42.

Scientific research shows that the effects of concussions can be long-lasting. *Bozeman*, [1] ¶ 43. The NCAA began conducting its own concussion-related studies

4

in 2003, one of which concluded that football players who had previous sustained a concussion were more likely to have future concussion-related injuries. *Bozeman*, [1] ¶ 56. Another NCAA study found that collegiate football players may require several days to recover from a concussion. *Bozeman*, [1] ¶ 56.

Plaintiffs claim that the SEC was in a better position than they were to know of and mitigate the risks of concussions and other traumatic brain injuries, *Bozeman*, [1] ¶ 32, and that the SEC has known of the harmful effects of concussions and subconcussive impacts for decades, *Bozeman*, [1] ¶¶ 60–61. Despite this knowledge, plaintiffs allege the SEC actively concealed these facts from student-athletes and the public. *Bozeman*, [1] ¶ 60. The SEC failed to adopt meaningful concussion management and return-to-play protocols until 2010.[4] *Bozeman*, [1] ¶¶ 62, 71.

Plaintiffs assert state common law claims of negligence, fraudulent concealment, breach of implied contract, breach of express contract, and unjust enrichment against the SEC.

## II. Personal Jurisdiction

The SEC moves to dismiss plaintiffs' complaints for lack of personal jurisdiction under Rule 12(b)(2) based on Judge Lee's prior ruling in the sample case, *Richardson v. Southeastern Conference*, 16-cv-9980. When a defendant makes a motion to dismiss for lack of personal jurisdiction, the plaintiffs have the burden of demonstrating the court has personal jurisdiction over the defendant. *Purdue*

---

[4] Plaintiffs allege that the protocols adopted in 2010 were and still are deficient. *Bozeman*, [1] ¶¶ 71, 75.

*Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citations omitted).

Generally, "[a] federal district court sitting in diversity must apply the personal jurisdiction rules of the state in which it sits." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d 695, 697 (7th Cir. 2015) (citation omitted). But, when a case has been transferred under 28 U.S.C. § 1407 (as these eight have), "the transferee judge has all the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re Testosterone Replacement Therapy Prod. Liab. Litig. Coord. Pretrial Proceedings*, 136 F.Supp.3d 968, 973 (N.D. Ill. 2015) (quoting *In re FMC Corp. Patent Litig.*, 422 F.Supp. 1163, 1165 (J.P.M.L. 1976)). The cases at issue here were transferred by the Judicial Panel on Multidistrict Litigation to this court from the Southern District of Indiana and the Eastern District of California. [3]; [38]; [184]; [255]. Under Indiana and California law, personal jurisdiction extends to the limits allowed by the Due Process Clause of the Fourteenth Amendment. *See* Ind. Trial P. Rule 4.4(A); *E&A Holdings, LLC v. Leviton Mfg. Co.*, No. 18-cv-02400, 2018 WL 6659729, at *3 (S.D. Ind. Oct. 24, 2018); Cal. Code Civ. Pro. § 410.10; *Farina v. SAVWCL III, LLC*, 50 Cal.App.5th 286, 294 (2d Dist. 2020). Therefore, the jurisdictional analyses under Indiana law, California law, and federal due process are the same.

Two types of personal jurisdiction exist: general and specific. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 ns. 8–9 (1984). General jurisdiction exists where the defendant has continuous and systematic general

6

business contacts with the forum. *See id.* at 416. Plaintiffs do not argue that there is general jurisdiction over the SEC in either Indiana or California. I agree with Judge Lee that there is no general jurisdiction over the SEC in Indiana, *Richardson*, 612 F.Supp.3d at 764–65, and further find there is no general jurisdiction over the SEC in California. *See* [431-1] ¶¶ 6, 7, 8, 12 (attesting to the absence of regular contacts with California).

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). "[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue." *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012) (citation omitted).

To be subject to specific jurisdiction, a defendant need only have sufficient "minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). "Jurisdiction is proper ... where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State." *Burger King*, 471 U.S. at 475 (quotation omitted). Courts look to the defendant's "conduct and connection with the forum State" to determine if he should "reasonably anticipate

7

being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (citation omitted).

### A. Hermann

Plaintiff Hermann's complaint alleges that the SEC "conduct[s] significant business in [the Eastern District of California], including establishing consumer and business contracts [t]here." *Hermann*, [1] ¶ 13. However, plaintiffs do not argue that the SEC is subject to specific jurisdiction in California and put forth no facts to support the conference's contacts there. With no evidence that the SEC has any contacts with California, let alone any related to Hermann's claims, the SEC cannot be subject to specific personal jurisdiction in California.

### B. Davison, Miller, and Calleja

Davison, Miller, and Calleja allege that the Southern District of Indiana has personal jurisdiction over the SEC because it conducts significant business in the district and the events and/or omissions giving rise to their claims occurred there. *Miller*, [1] ¶ 13; *Davison*, [1] ¶ 13; *Calleja*, [1] ¶ 21. Yet, Davison, Miller, and Calleja all allege nearly identical facts to those alleged in *Richardson*. Like Richardson, all three played college football for SEC member institutions before the NCAA moved to Indiana and never played college football in Indiana. Miller, [1] ¶ 76; *Davison*, [1] ¶ 78; *Calleja*, [1] ¶ 24 [431-1] ¶ 13. With no factual differences between the cases other than when and where they played college football (which was not in Indiana), Judge Lee's jurisdictional analysis applies directly to *Davison*, *Miller*, and *Calleja*, and I concur with his analysis. There is no specific personal jurisdiction over the SEC in these three cases.

## C. Bozeman, Williams, Owens, and Ford

Plaintiffs argue that the SEC is subject to specific jurisdiction in Indiana in *Bozeman*, *Williams*, *Owens*, and *Ford* for three reasons. First, the SEC's misconduct allegedly occurred in significant part in Indiana where the SEC participated in shaping NCAA rules and regulations on health and safety in collegiate football after the NCAA moved its headquarters to Indiana in 2000. [432] at 2, 8–10. Second, the SEC purposefully availed itself of Indiana by aiming television broadcasting at the state. [432] at 10–11. And third, Owens and Ford played at least one football game in Indiana as student-athletes. [432] at 11.

Despite these plaintiffs' attempts to argue that these additional contacts in their cases establish specific jurisdiction, these minor factual differences do not materially distinguish their cases from *Richardson*.

First, plaintiffs argue that after the NCAA moved to Indiana in 2000, SEC representatives travelled to Indiana to help shape the NCAA rules and regulations at the heart of these lawsuits. [432] at 8. Plaintiffs cite to exhibits Richardson attached to his brief in opposition to the SEC's motion to dismiss, arguing that they "carry more weight for Plaintiffs Bozeman, Williams, Owens, and Ford, who played football while the NCAA was headquartered in Indiana." [432] at 9. These exhibits point to certain individuals from SEC member institutions who, according to plaintiffs, served on "the key committees and working groups that have been responsible for acting on (or failing to act on) the medical information about concussion and traumatic brain injury risks to student athletes." [432] at 9.

9

w

Only two of the NCAA meetings presented by Richardson addressed concussions. *Richardson*, [49-11] at 82. During the April 2017 meeting of the NCAA Division I Strategic Vision and Planning Committee, the Sport Science Institute staff "[p]rovided an update on the current 2017 Division I Concussion Safety Protocol Review process and shared the two changes that were made to the concussion safety protocol checklist that institutions will be using." *Richardson*, [49-11] at 80. The meeting notes state that "Jay Jacobs, Auburn University; Southeastern Conference" was in attendance, but do not make clear that Jacobs was in attendance on behalf of the SEC instead of Auburn University. *Richardson*, [49-11] at 82.

At the April 2017 meeting of the NCAA Division I Council, the council received an update regarding the engagement of the NCAA's governance structures on issues of student-athlete health and safety issues. It also identified next steps, which included, "[e]xamin[ing] identified football-related issues, including … concussion data." *Richardson*, [49-11] at 12. Mitch Barnhart of the "University of Kentucky; Southeastern Conference" attended meeting. *Richardson*, [49-11] at 13. The meeting report does not make clear that Barnhart was in attendance on behalf of the SEC instead of the University of Kentucky, though Barnhart was the SEC voting delegate on the NCAA Division I Council. *See Richardson*, [49-11] at 54–59. While these two meetings did address concussions, they occurred in 2017—years after the plaintiffs played football and were injured. Plaintiffs fail to connect these two SEC contacts with the NCAA in Indiana to their specific claims.

Plaintiffs also do not connect any of the other contacts to their claims. I agree with Judge Lee's finding that the contacts Richardson presented are not sufficient to establish specific jurisdiction over the SEC in Indiana. *Richardson*, 612 F.Supp.3d at 765–66.

Plaintiffs present additional evidence of SEC contacts with the NCAA in Indiana: the SEC commissioner participated in the NCAA Division I Football Study Oversight Committee in 2002, which produced an 80-page report that covered topics including student-athlete welfare. [432] at 9 (citing [433], Ex. 1-A at 3 (filed under seal), Ex. 1-F, NCAA Letter to FSOC (filed under seal)). Yet, as the SEC points out, this report and meeting were not focused on concussions or head injuries and are unrelated to plaintiffs' claims. [440] at 8–9. The student-athlete welfare subcommittee had no SEC representative and offered recommendations limited to out-of-season practice time limits, academic performance and graduation rates, use of nutritional supplements, and gambling. [433], Ex. 1-A at 15–18 (filed under seal). While plaintiffs' allegations do include injuries that occurred during practice, the report's recommendations on out-of-season practice are related to heat-related injuries, not head injuries. [433], Ex. 1-A at 15 (filed under seal).

Plaintiffs also argue that the Football Study Oversight Committee study served as basis for a NCAA proposal meant to "minimize the health and safety risks to student athletes." [432] at 9 (citing [432-8] at 5). But, again, this proposal does not relate to plaintiffs' claims of head injuries and concussions, but instead aims to reduce incidents of heat-related illness. [432-8] at 5–6.

11

As to their contract and quasi-contract claims, plaintiffs do not argue that the SEC did anything in Indiana that gave rise to these claims. *See RAR, Inc. v. Turner Diesel, Ltd.,* 107 F.3d 1272, 1278 (7th Cir. 1997) ("[I]n a breach of contract case, it is only the dealings between the parties in regard to the disputed contract that are relevant to minimum contacts analysis.") (quotation omitted). Nor do plaintiffs point to anything that SEC representatives did that might be relevant to those claims.

As for plaintiffs' fraudulent concealment claims, where a plaintiff alleges an intentional tort, like fraudulent concealment, "the inquiry focuses on whether the conduct underlying the claim[] was purposely directed at the forum state." *Felland*, 682 F.3d at 674 (quoting *Tamburo*, 601 F.3d at 702). Here, plaintiffs allege that the SEC fraudulently concealed the risks caused by concussive and subconcussive injuries in order to induce them to play football for SEC member institutions. *Bozeman*, [1] ¶ 109. Plaintiffs allege that had they known what the SEC knew, they would not have continued to play after a head injury, would have taken additional precautions after sustaining such an injury, or would have quit football altogether. *Bozeman*, [1] ¶ 112. Plaintiffs also allege that, until 2010, the SEC knowingly withheld crucial information regarding the life-long consequences that repetitive brain injuries could have on them. *Bozeman*, [1] ¶¶ 60–62. Nowhere do plaintiffs allege that the SEC took any actions in Indiana or directed any actions specifically at Indiana—by an authorized representative or otherwise—giving rise to this claim. *See Richardson*, 612 F.Supp.3d at 766.

12

The same is true with respect to plaintiffs' negligence claims against the SEC. Plaintiffs do not identify any actions by the SEC in Indiana or directed at Indiana that can form the basis of this claim. And plaintiffs do not identify any actions taken by the alleged SEC representatives that could be relevant to their negligence claims.

Second, plaintiffs argue that the SEC purposefully availed itself of Indiana by broadcasting sports programming there, generating enormous profits while concealing the dangers of repetitive head trauma. [432] at 10–11. The SEC does not and has never operated a broadcast network. [431-1] ¶ 9. Instead, the SEC licenses broadcast rights to SEC championships, "home" games, and member institutions' events. [431-1] ¶ 9. The SEC's efforts to license rights to television programming that broadcasts in all fifty states is insufficient to justify personal jurisdiction in Indiana. *Richardson*, 612 F.Supp.3d at 764. The SEC was not specifically targeting Indiana—it licenses games to networks that broadcast in Indiana and all other states. Personal jurisdiction cannot be based on activities that are conducted by a third party, not the defendant itself. *Walden v. Fiore*, 571 U.S. 277, 284 (2014); see *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 268 (2017) ("The bare fact that [defendant] contracted with a California distributor is not enough to establish personal jurisdiction in the State."); *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 471 (1st Cir. 1990) (holding that the National Hockey League's negotiation of telecasting contracts in Rhode Island was not enough to establish personal jurisdiction). The SEC's broadcast licensing contacts do not support specific jurisdiction in Indiana.

13

Third, plaintiffs argue that Owens and Ford played at least one college football game in Indiana. [432] at 11. But the SEC was not involved in the organization of these away games. [431-1] ¶ 12, 14. The SEC also did not have any broadcasting rights or licensing rights to these football games against non-conference opponents. [431-1] ¶ 14. Owens and Ford also do not connect these two games to their claims. With the SEC's lack of involvement in these games, the two games cannot support specific jurisdiction over the SEC in Indiana.

Considering that none of these contacts suffice to show the SEC had contacts in Indiana related to plaintiffs' claims, even taking them collectively is not enough to support specific personal jurisdiction over the SEC in Indiana. Further, as plaintiffs have failed to make a colorable showing of personal jurisdiction, plaintiffs' request to take jurisdictional discovery, [432] at 12–13, is denied. *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000).

### III. Plaintiffs' Request for Transfer

Plaintiffs ask to transfer the cases to appropriate venues pursuant to 28 U.S.C. § 1631 or 28 U.S.C. § 1406, if I find that Indiana and California courts cannot assert jurisdiction over the SEC. [432] at 13–16, 13 n. 6.

I deny this request. Under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), an MDL transferee court does not have the authority to transfer a consolidated case. *Lexecon* held that a district court to which cases have been transferred pursuant to 28 U.S.C. § 1407 for pretrial proceedings cannot, after conclusion of the pretrial proceedings, transfer the case to itself for trial under 28 U.S.C. § 1404(a). 523 U.S. at 40.

"Although *Lexecon*'s holding applies explicitly only to § 1404(a)—the only statute under which the transferee district court in that case purported to transfer venue—*Lexecon*'s reasoning applies equally to transfers pursuant to any venue statute." *Shah v. Pan Am. World Servs., Inc.*, 148 F.3d 84, 90 (2d Cir. 1998); *see also Kalama v. Matson Navigation Co., Inc.*, 875 F.3d 297, 308 (6th Cir. 2017) (finding the transferor court "correctly held that it had no authority to transfer plaintiff-appellants' claims to a district with proper jurisdiction" under *Lexecon*). The language of 28 U.S.C. § 1407(a) unconditionally commands that any transfer actions be taken solely by the JPML. *Lexecon*, 523 U.S. at 34–36. "[N]o exercise in rulemaking can read … out of the statute" the JPML's obligation to remand each action to its respective transferee court at or before the conclusion of pretrial proceedings. *Lexecon*, 523 U.S. at 37.

Even if I were able to transfer the cases, transfer under § 1631 or § 1406 is only warranted if it is in the interest of justice. Plaintiffs argue that it is in the interest of justice to transfer the cases because there is a risk that plaintiffs' claims will be time barred if dismissed and then re-filed in appropriate jurisdictions. [432] at 14–15. While plaintiffs argue that "the lapse in time in challenging jurisdiction was not the[ir] fault," [432] at 14, the March 2020 decision in *Richardson*, as a sample case, should have served as a warning that plaintiffs needed to cure the jurisdictional deficiencies in their complaints. Plaintiffs were on notice that the rationale of the sample case would apply to others. Recommending remand back to a federal court that does not have jurisdiction over the SEC, so that it could transfer to a venue with

15

jurisdiction might have been an appropriate step back when Judge Lee decided *Richardson*. But plaintiffs did not suggest that procedure. After Richardson acceded to judgment and did not appeal, the passage of time does not provide a reason to deviate from the parties' choice to rely on sample cases to set their expectations.

### IV. Rule 54(b) Dismissal

The SEC asks for entry of final judgment dismissing it under Rule 54(b). [431] at 20. In a case involving multiple parties or more than one claim, "the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b).

Entry of Rule 54(b) final judgment requires "two determinations: (1) that the order in question was truly a 'final judgment,' and (2) that there is no just reason to delay the appeal of the claim that was 'finally' decided." *Gen. Ins. Co. of Am. v. Clark Mall Corp.*, 644 F.3d 375, 379 (7th Cir. 2011) (citing *Sears, Roebuck & Co. v. Mackey*, 351 U.S. 427, 435–37 (1956)). "The goal of [the] analysis is to prevent 'piece-meal appeals' involving the same facts." *Peerless Network, Inc. v. MCI Commc'ns Servs., Inc.*, 917 F.3d 538, 543 (7th Cir. 2019) (quoting *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 10 (1980)).

First, a judgment "must be 'final' in the sense that it is 'an ultimate disposition of an individual claim entered in the course of a multiple claims action.'" *Curtiss-Wright*, 446 U.S. at 7 (quoting *Sears*, 351 U.S. at 436). Determining whether a judgment is properly appealable under Rule 54(b) "involves comparing the issues at stake in the appealed claims and those remaining in the district court." *Marseilles*

16

*Hydro Power, LLC, v. Marseilles Land & Water Co.*, 518 F.3d 459, 464 (7th Cir. 2008) (citation omitted). To prevent piece-meal litigation, the Court should "consider such factors as whether the claims under review [are] separable from the others remaining to be adjudicated and whether the nature of the claims already determined [is] such that no appellate court would have to decide the same issues more than once even if there [are] subsequent appeals." *Curtiss-Wright*, 446 U.S. at 8; *see ODC Commc'ns Corp. v. Wenruth Invs.*, 826 F.2d 509, 512 (7th Cir. 1987).

The judgment that there is no personal jurisdiction over the SEC in these eight cases is final. The SEC is no longer involved in these cases. Entry of partial final judgment when one or more defendants is dismissed for lack of personal jurisdiction is appropriate. *Smith v. Jefferson Cnty. Bd. of Educ.*, 378 F.App'x 582, 586 (7th Cir. 2010); *Illinois Bell Tel. Co. v. Glob. NAPs Illinois, Inc.*, 551 F.3d 587, 596 (7th Cir. 2008); *Vioski v. Calaveras Asbestos, Ltd.*, 929 F.2d 352, 352 (7th Cir. 1991); *see also Lauderdale-El v. Indiana Parole Bd.*, 35 F.4th 572, 577 (7th Cir. 2022) (holding dismissals for lack of personal jurisdiction are necessarily without prejudice (citing *Rogers v. City of Hobart*, 996 F.3d 812, 817 (7th Cir. 2021))).

The issue decided here, whether there is personal jurisdiction over the SEC in Indiana and California, is separable from plaintiffs' other remaining claims and would not require the appellate court to decide the same issues more than once even if there are subsequent appeals. Therefore, the SEC's request for Rule 54(b) final judgment is appropriate and granted.

17

## V. Conclusion

For the reasons set out above, the SEC's motion to dismiss for lack of jurisdiction and motion for final judgment under Rule 54(b) are granted. The clerk shall enter separate judgment orders dismissing the SEC from each of these cases without prejudice for lack of personal jurisdiction.

ENTER:

                                                                                                           _____
                                                                                                           Manish S. Shah
                                                                                                           United States District Judge

Date: October 4, 2023