UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL COLLEGIATE ATHLETIC ASSOCIATION STUDENT-ATHLETE CONCUSSION INJURY LITIGATION—SINGLE SPORT/SINGLE SCHOOL (FOOTBALL) | MDL No. 2492<br><br>Master Docket No. 16 CV 8727<br><br>Judge Manish S. Shah |

MEMORANDUM OPINION AND ORDER

The Single Sport/Single School Multidistrict Litigation is an offshoot from a medical monitoring settlement in an earlier MDL involving claims related to concussions allegedly sustained by student-athletes at NCAA member institutions. The original purpose of the Single Sport/Single School MDL was to test the viability of class claims for money damages under Fed. R. Civ. P. 23(b)(3). Late last year, plaintiffs abandoned their Rule 23(b)(3) damages class claims and now seek leave to move for certification of five issues under Rule 23(c)(4). The defendant NCAA argues that plaintiffs released their right to seek issue-only certification in the Medical Monitoring Settlement Agreement. I agree. Further, even if plaintiffs had not released this right, they would not succeed on certifying the proposed issues under Rule 23.

I. **Background**

In 2011, two plaintiffs brought putative class action suits on behalf of proposed classes of NCAA student-athletes against the NCAA and its member institutions. *See*

*Arrington v. NCAA*, No. 11-cv-6356 (N.D. Ill. 2011), [1] ¶ 39.[1] The actions asserted claims for bodily injury damages allegedly resulting from concussions sustained while playing college sports and requested injunctive relief and medical monitoring. *See* 11-cv-6356, [1] ¶¶ 48–67. In July 2013, the *Arrington* plaintiffs sought certification of a medical monitoring class under Rule 23(b)(2) and a "core issues" class under Rule 23(c)(4) on issues that included whether the NCAA owed a duty to safeguard class members. 11-cv-6356, [174] at 1–2.

In October 2013, two absent class members represented by Edelson PC, the now lead plaintiffs' counsel in the Single Sport/Single School MDL, filed a motion to intervene in *Arrington*. 11-cv-6356, [195]. The absent class members sought leave to intervene because the pending motion did not seek certification of class claims for bodily injury damages. *Id.* at 2, 11–14. They argued that "a damages class could and should have been pursued beyond one limited to 'core issues,'" where, at best, intervenors "would receive answers to amorphous 'core questions' about the NCAA's liability, such as … whether the NCAA owed a duty to each class member." *Id.* at 11–12, 14.

Other putative class actions were filed against the defendants, and in December 2013, the Judicial Panel on Multidistrict Litigation transferred all related cases to the Northern District of Illinois, consolidating them under *In re: NCAA*

---

[1] Bracketed numbers without reference to a specific case number refer to entries on the district court docket in *Langston v. Mid-America Intercollegiate Athletics Association*, No. 17-cv-4978 (N.D. Ill. 2017). Bracketed numbers with reference to a specific case number refer to entries on the district court docket in that case. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. When a document has numbered paragraphs, I cite to the paragraph, for example [1] ¶ 1.

*Student-Athlete Concussion Injury Litigation*, MDL No. 2492, No. 13-cv-9116 (N.D. Ill. 2013). *See* 13-cv-9116, [1].

In May 2014, the Edelson firm filed a motion seeking to be appointed as lead counsel of the personal injury class claims. 13-cv-9116, [50]. It asserted that by filing a motion for class certification that did not seek certification of claims for damages, counsel for the *Arrington* plaintiffs had "abandon[ed] the [personal injury] claims at certification with no notice to absent class members" and "class members with personal injuries became exposed to statute of limitations, statute of repose, and improper claim splitting defenses, all of which could have the effect of barring their ability to recover for personal injuries suffered." *Id.* at 3.

In July 2014, the *Arrington* plaintiffs filed a motion for preliminary approval of a settlement agreement to resolve concussion-related claims of a nationwide class of former NCAA student-athletes. 13-cv-9116, [64]. The proposed settlement agreement provided for the creation of a medical monitoring fund and released class members' right to bring any class claims related to alleged concussions sustained while playing an NCAA sport, including class claims for bodily injury damages. 13-cv-9116, [64-1] at 20–38.

One plaintiff, represented by Edelson PC, objected to the proposed settlement, arguing that it did not provide monetary relief but would release class members' right to bring injury claims on a class-wide basis under Rule 23(b)(3). 13-cv-9116, [83]. Judge Lee denied the motion for preliminary approval. 13-cv-9116, [115]. The parties revised the settlement agreement and again moved for preliminary approval. 13-cv-

3

9116, [154]. The same plaintiff objected again and Judge Lee ordered briefing on "the viability of a personal injury damages class under Rule 23(b)(3)." 13-cv-9116, [182].

In January 2016, Judge Lee concluded that the likelihood of certification of a nationwide bodily injury class was "minimal, at best." *In re NCAA Student-Athlete Concussion Inj. Litig.*, 314 F.R.D. 580, 590 (N.D. Ill. 2016). Considering the feasibility of a narrower, single sport/single school Rule 23(b)(3) class, Judge Lee noted such claims would "face significant, perhaps insurmountable, hurdles," but that he was "simply [] unable to evaluate the strength (or value) of such a procedural claim on the limited record before [him]." *Id.* at 597. Further discovery could reveal that "[p]erhaps there is a putative personal injury class that a potential plaintiff could allege— limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied—that might be appropriate for certification under Rule 23(b)(3)." *Id.* Accordingly, the class waiver had to be limited to exclude single sport/single school class claims filed against the NCAA and member institutions. *Id.* at 605.

The second amended settlement agreement still included a release of most class claims but excluded from the release "personal or bodily injuries class claims brought on behalf of a class of persons who allege injury resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA member school." 13-cv-9116, [266-1] at 19. Judge Lee granted preliminary and final approval of the second amended agreement in July 2016 and August 2019. 13-cv-9116, [276], [552].

4

There are over 580 putative class action cases consolidated in this MDL, each brought on behalf of a proposed class of former football players at one NCAA member institution and seeking certification of bodily injury damages classes under Rule 23(b)(3). *See* 16-cv-8727 (Single Sport/Single School MDL master docket listing member cases). In November 2016, the parties agreed to select four "sample cases to test the viability of the Single Sport/Single School cases through class certification." 16-cv-8727, [72] at 3. Non-sample cases were (and remain) stayed. 16-cv-8727, [259] at 3. The parties then conducted discovery in the sample cases on the issue of whether a Rule 23(b)(3) damages class could be certified. [132] at 2–3.

In late 2022, plaintiffs decided to forgo their request for certification of a Rule 23(b)(3) damages class and instead decided to seek issue certification for class-wide resolution under Rule 23(c)(4). *See* [144] at 2–3 ("[P]laintiffs have expressly abandoned any attempt to certify a class action under Rule 23(b)(3) to seek class-wide damages .... This applies not only to the sample cases but to all cases in this MDL.")

At my request, plaintiffs filed a motion to proceed with issue-based class certification under Rule 23(c)(4). *See* [144] at 3–4; [154]; 17-cv-1402, [150]; 17-cv-4975, [149]; 16-cv-9980, [167].

## II.   Analysis

Plaintiffs seek to certify the following classes:

***Langston* Student-Athlete Class**: All individuals who participated in Pittsburg State University's NCAA-sanctioned football program between 1958 and 2010, or their authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law.

*Young* **Derivative Class**: Spouses, parents, children who are dependents, or any other persons who properly under applicable state law assert the right to sue independently or derivatively by reason of their relationship with individuals who participated in Pittsburg State University's NCAA-sanctioned football program between 1958 and 2010.

*Richardson* **Class**: All individuals who participated in the University of Florida's NCAA-sanctioned football program between 1958 and 2010, or their authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law.

*Rose* **Class**: All individuals who participated in Purdue University's NCAA-sanctioned football program between 1958 and 2010, or their authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law.

*Weston* **Class**: All individuals who participated in Weber State's NCAA-sanctioned football program between 1958 and 2010, or their authorized representatives, ordered by a court or other official of competent jurisdiction under applicable state law.

[155] at 11–12. Plaintiffs propose the following issues for certification under Rule 23(a), 23(b)(3), and 23(c)(4):

1. Has the NCAA, since at least 1958, owed a legally cognizable duty of care to members of the proposed classes?

2. Has the NCAA known, since at least 1958, that head impacts in college football could cause long-term brain damage or degenerative brain disease?

3. Should the NCAA have known, since at least 1958, that head impacts in college football could cause long-term brain damage or degenerative brain disease?

4. Is playing NCAA football a cause of Chronic Traumatic Encephalopathy (CTE)?

    a. Is CTE a generally accepted neuropathologic diagnosis with generally accepted diagnostic criteria?

    b. Is there a causal relationship between repetitive head impacts and CTE?

    c. Do NCAA football players sustain the types of repetitive head impacts that have a causal relationship with CTE?

6

5. Is playing NCAA football a cause of Traumatic Encephalopathy Syndrome (TES)?

> a. Is TES a generally accepted clinical syndrome with generally accepted diagnostic criteria?

> b. Is there a causal relationship between repetitive head impacts and TES?

> c. Do NCAA football players sustain the type of repetitive head impacts that have a causal relationship with TES?

[155] at 12–13.

The NCAA argues that it's too late to change class certification theories. [162] at 18–20 (citing *Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015)). In *Chapman*, the court affirmed that a plaintiff's motion for leave to file an amended complaint to alter a class definition was untimely. 796 F.3d at 785. The district court had rejected the plaintiff's request for leave "to remake [his] suit more than four years after it began" as untimely because the plaintiff had already moved for and lost class certification. *Id.* While it has been over six years since the creation of this MDL, plaintiffs here have proposed pursuing issue-based certification before formally moving for class certification. *See also Millman v. United Techs. Corp.*, No. 1:16-CV-312-TLS, 2019 WL 1362617, at *3 (N.D. Ind. Mar. 25, 2019) (granting plaintiffs leave to alter class issues because "unlike in *Chapman*, this Court has not yet ruled upon the Plaintiffs' Motion for Class Certification."). Plaintiffs' request is not the "second bite at the apple" that was impermissible in *Chapman. See Chapman v. First Index, Inc.*, No. 09 C 5555, 2014 WL 3511227, at *3 (N.D. Ill. July 16, 2014).

Even though their request is not untimely, plaintiffs' request for issue certification fails because plaintiffs released their right to pursue issue-only

7

certification in the Medical Monitoring Settlement Agreement, and plaintiffs' proposed classes and issues fail to satisfy Rule 23.

## A.  The Medical Monitoring Settlement Release

The NCAA argues that the Medical Monitoring Settlement released and waived plaintiffs' right to assert requests for class treatment of issues under Rule 23(c)(4). [162] at 23–27. The Settlement releases:

> [A]ny and all claims, actions, causes of action, rights, demands, suits, debts, liens, contracts, agreements, offsets or liabilities brought or pursued on a class-wide basis (other than claims pursued on behalf of a class of persons who allege personal injuries or bodily injuries resulting from their participation in a single NCAA-sanctioned sport at a single-NCAA member school, and relating to concussions or sub-concussive hits or contract), including but not limited to tort claims, claims for breach of contract, breach of statutory duties, … compensatory and punitive damages, injunctive or declaratory relief, requests for class treatment of issues under Fed. R. Civ. P. 23(c)(4) or state law counterparts thereto, requests for attorneys' fees, interests, costs, penalties and any other claims … which the Class Representatives or any Settlement Class Member had[.]

13-cv-9116, [266-1] at 18–19. The agreement also states, "'Released Claims' does not include … personal or bodily injury class claims brought on behalf of a class of persons who allege injury resulting from their participation in a single NCAA-sanction sport at a single-NCAA member school." *Id.* at 19. The agreement is "construed under and governed by the laws of the State of Illinois." *Id.* at 69.

Under Illinois law, construction and enforcement of settlement agreements, including releases, are governed by principles of contract law. *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014). "[T]he goal of contract interpretation is to ascertain the parties' intent." *Beach Forwarders, Inc. v. Serv. By Air, Inc.*, 76 F.4th 610, 613 (7th Cir. 2023). A court first looks to "the plain and ordinary meaning of the contract

language." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022). If the contract language is susceptible to more than one meaning, it is ambiguous, and a court can consider extrinsic evidence to determine the parties' intent. *Thompson v. Gordon*, 241 Ill.2d 428, 441 (2011). "The question of whether a contract is clear or ambiguous is a question of law for the court." *Platinum Supplemental Ins., Inc. v. Guarantee Tr. Life Ins. Co.*, 989 F.3d 556, 563 (7th Cir. 2021). "Mere disagreement between the parties as to meaning does not itself make the contract ambiguous, and the court will not strain to find an ambiguity where none exists." *Page*, 52 F.4th at 346.[2]

The Medical Monitoring Settlement specifically releases issues classes. The release includes "requests for class treatment of issues under Fed. R. Civ. P. 23(c)(4)." 13-cv-9116, [266-1] at 19. It excepts personal or bodily injury claims brought on behalf of a class of single-sport/single-school players from its coverage. *Id.* at 18–19. Plaintiffs argue that the distinction between the excepted claims and the released claims is the scope of the class. [163] at 11. It is true that the carved-out claims can only be brought on behalf of a single sport/single school class as compared to a wider class. But after enumerating a long list of released "claims, actions, causes of action, rights, demands, suits, debts, liens, contracts, agreements, offsets or liabilities," the release specifically limits the carveout to "claims" brought on behalf of a single sport/single school class. 13-cv-9116, [266-1] at 18.

---

[2] *Cf. Pulsifer v. United States*, No. 22-340, 2024 WL 1120879, at *14 (U.S. Mar. 15, 2024) (existence of two grammatically permissible readings of statute is not a genuine ambiguity when only one reading makes sense in context).

The issue here is whether seeking certification of issues on behalf of a single sport/single school class falls under pursuing the "claims" exempted by the agreement. The NCAA argues that a "claim" is a claim for relief or an assertion of the right to a remedy. [162] at 25. In its characterization, pursuing issue certification is not pursuing relief on behalf of the proposed classes. *Id*. Under this logic, plaintiffs are no longer pursuing class "claims" as carved out from the Medical Monitoring Settlement Agreement. *Id*.

Plaintiffs argue that they are still pursuing bodily injury claims on behalf of single sport/single school classes, and that the only difference between their proposed Rule 23(c)(4) approach and a 23(b)(3) damages class is that the class-wide portion of the proceedings is more limited. [163] at 10.

Although the term "claim" is not defined in the agreement, the agreement is not ambiguous. "Undefined terms will be given their plain, ordinary, and popular meaning; *i.e.*, they will be construed with reference to the average, ordinary, normal, reasonable person." *Page*, 52 F.4th at 346. Black's Law Dictionary defines "claim" as a "demand for money, property, or a legal remedy to which one asserts a right." *Claim*, *Black's Law Dictionary* (11th ed. 2019). In contrast, an "issue" is a "point in dispute between two or more parties." *Issue, Black's Law Dictionary* (11th ed. 2019).

Pursuing a class claim is different than pursuing a class issue. One seeks relief on behalf of the class while the other seeks to settle a point in dispute between the defendant and the class. While seeking relief inherently necessitates settling points

in dispute between parties, seeking to settle points in dispute and ending the class action there is not demanding any remedy for the class.

Plaintiffs argue that this analysis would preclude a single sport/single school class from seeking other class relief released in the agreement, such as attorneys' fees, injunctive relief, or punitive damages. [163] at 11 n. 3. Not so. Single sport/single school class *claims* are excepted from the release, and such a class has free rein to pursue any relief. The release is inapplicable to a class claim for relief.[3]

Plaintiffs are no longer seeking relief on behalf of a class; they have abandoned their pursuit of a Rule 23(b)(3) damages class. *See* [144] at 2–3. Instead, plaintiffs are seeking individual relief, while proposing to resolve points in dispute on a class-wide basis. The Medical Monitoring Settlement Agreement released plaintiffs' right to pursue issue certification and the carveout only applies to plaintiffs seeking relief on behalf of a single sport/single school class.[4]

---

[3] *Cf. In re NCAA Student-Athlete Concussion Inj. Litig.*, 332 F.R.D. 202, 217 (N.D. Ill. 2019), *aff'd sub nom. Walker v. NCAA*, No. 19-2638, 2019 WL 8058082 (7th Cir. Oct. 25, 2019) (granting final approval and noting that single sport/single school class-wide injunctive relief would still be available: "[T]o the extent that any student-athlete wishes to seek additional safety protocols for a particular sport, he or she may bring such a claim against the NCAA on an individual or single-sport/single-school basis.").

[4] The agreement is not ambiguous, so resort to extrinsic evidence is unnecessary. *Thompson*, 241 Ill.2d at 441. But the background to the settlement demonstrates that the parties understood that the carveout was intended to cover damages classes and that class certification on issues was not to be pursued. *See, e.g., In re NCAA*, 314 F.R.D. at 584, 597 (Judge Lee required the parties to carve out single sport/single school classes because "[p]erhaps there is a putative *personal injury class* that a potential plaintiff could allege— limited to a particular school, a particular sport, and a narrow time period during which substantially similar concussion-related practices and policies were consistently applied— that might be appropriate for certification under *Rule 23(b)(3)*.") (emphasis added).

B. **The Merits of Issues Class Certification**

Even if plaintiffs had not released their right to seek issue certification on behalf of a single sport/single school class, plaintiffs' attempt to certify class issues fails. Plaintiffs seek leave to file a full motion for class certification. [155] at 13. But the record before me now demonstrates that plaintiffs will be unable to satisfy Rule 23 to certify their issues.

Under Rule 23(c)(4), "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). The text of Rule 23(c)(4) does not modify the certification requirements of Rule 23(a) or 23(b); but it provides for issue-only actions "[w]hen appropriate." *McLaughlin on Class Actions* § 4:43 (20th ed.). There are no express requirements to determine "appropriate[ness]," suggesting that issue certification is "appropriate" when the requirements of Rule 23 are otherwise satisfied. *Id.* Therefore, plaintiffs must still demonstrate the proposed classes and issues satisfy Rule 23(a) threshold requirements and are maintainable under Rule 23(b). *See Black v. Occidental Petrol. Corp.*, 69 F.4th 1161, 1187–88 (10th Cir. 2023) (citing *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005)).

Under Rule 23(a), a plaintiff must satisfy four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequate representation. Fed. R. Civ. P. 23(a). The parties do not presently dispute that plaintiffs' proposed classes satisfy Rule 23(a)'s threshold requirements.

After meeting this threshold, the plaintiff must demonstrate "through evidentiary proof" that the putative class action falls under one of the three prongs of

Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); Fed. R. Civ. P. 23(b). Plaintiffs here argue they will satisfy Rule 23(b)(3), [155] at 27, which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1.    *Rule 23(b)(3) Predominance*

The predominance inquiry focuses on whether a proposed class is "sufficiently cohesive to warrant adjudication by representation." *Gorss Motels, Inc. v. Brigadoon Fitness, Inc.*, 29 F.4th 839, 843 (7th Cir. 2022) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). Scrutiny should be given to "the relation between common and individual questions in a case." *Tyson Foods*, 577 U.S. at 453. In other words, evaluating predominance "requires more than a tally of common questions; the district court must consider their relative importance." *Eddlemon v. Bradley Univ.*, 65 F.4th 335, 339 (7th Cir. 2023).

When plaintiffs seek certification of common issues under Rule 23(c)(4), the majority rule across circuits is that Rule 23(b)(3)'s predominance and superiority requirements must only be met as to the issues for class-wide resolution. *See Newberg and Rubenstein on Class Actions* § 4:90 ("[T]here is [] widespread consensus in support of the broad view that common questions need not predominate in an entire lawsuit or cause of action in order for certification to be proper."); *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 273 (3d Cir. 2021), *cert. denied*, 142 S.Ct. 2706 (2022). While the Seventh Circuit has not explicitly adopted this view,

district courts in this circuit have found that "the Seventh Circuit likely would follow the trend of authority holding that a court may employ Rule 23(c)(4) to certify a class as to [an issue] regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, No. 14-CV-5696, 2017 WL 1196990, *62 (N.D. Ill. Mar. 31, 2017) (quotations omitted).

The predominance analysis begins by identifying the elements of the plaintiff's claims. *Eddlemon*, 65 F.4th at 339. A court must "understand what the plaintiffs will need to prove and ... evaluate the extent to which they can prove their case with common evidence." *Id.*

Plaintiffs' proposed issues all relate to their negligence claims against the NCAA. The NCAA argues that the laws of multiple states will apply to each class's claims and asserts that the four sample cases alone implicate the laws of at least 27 states. [162] at 29–32, 37. In determining what law to apply in tort actions, Indiana, Kansas, and Illinois—the state choice-of-law rules applicable to the sample cases— all use the law of the place where the injury occurred. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002) ("Indiana is a *lex loci delicti* state."); *Anderson v. Com. Const. Servs., Inc.*, 531 F.3d 1190, 1194 (10th Cir. 2008) (same for Kansas); *Townsend v. Sears, Roebuck & Co.*, 227 Ill.2d 147, 164 (2007) (In Illinois, "the law of the place of injury controls unless another state has a more significant relationship with the occurrence.").

The NCAA speculates that there may be a case where a proposed class member's CTE was caused by a single concussion at one out-of-state away game, so that student-athlete would have a different place of injury than other class members. [162] at 30. But each sample class plaintiff alleges that their injuries were caused by sustained and repeated head impacts, most occurring during practices, and each class consists of athletes from only one school. *See, e.g.*, [98] ¶ 74; [163-1] at 152:3–8 ("[N]orth of 60 percent of the head trauma hits happen in practice."); 16-cv-9980, [1] ¶ 81; 17-cv-4975, [1] ¶ 74; 17-cv-1402, [1] ¶¶ 80, 89. It is unlikely that the proposed classes here will implicate as many states' laws as the NCAA suggests.

Even in the unlikely event that multiple states' laws apply, the fundamental elements of negligence are fairly uniform across the states. For example, in all four states where the sample case plaintiffs played football (Florida, Indiana, Pennsylvania, and Utah), a negligence claim has four elements: (1) a duty by the defendant to conform to a certain standard of conduct; (2) a breach by the defendant of that duty; (3) a causal connection between the breach and injury to the plaintiff; and (4) loss or damage to the plaintiff. *Barnett v. Dep't of Fin. Servs.*, 303 So.3d 508, 513–14 (Fla. 2020); *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515, 523 (Ind. 2014); *Donovan v. Sutton*, 2021 UT 58, ¶ 17; *Grove v. Port Auth. of Allegheny Cnty.*, 655 Pa. 535, 554 (2019). To be sure, using too high a level of generality could lead me to impermissibly "create a composite legal standard that is the positive law of no jurisdiction." *See Mejdrech v. Met-Coil Sys. Corp.*, 319 F.3d 910, 912 (7th Cir. 2003); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). But at least when limited to

the four sample cases, it seems unlikely that individualized choice-of-law inquiries will overwhelm the common questions of duty, breach, and general causation.

But what does present a problem, even before embarking on a full-throated motion for class certification, is plaintiffs' proposal to certify issues on a class-wide basis over a 52-year period. The evidence needed to answer some of plaintiffs' proposed issues will almost certainly vary over that 52-year period depending on when class members played college football. Although the answers may not depend on evidence specific to individual class members, a single common set of information is not likely to predominate within the issues even as framed by plaintiffs.

Plaintiffs seek to establish that the NCAA owed a duty to all student-athletes since 1958 by virtue of its special relationship with students and argue that each student-athlete "was in the same relationship with the NCAA as each other [c]lass member." [155] at 28–29; [163] at 20–21. But plaintiffs don't identify anything to suggest that the NCAA's special relationship to student-athletes provides a uniform tort duty to football players across the decades.

The question of whether football can cause CTE or TES generally will depend on how the sport was played, the equipment used, and safety protocols in place from 1958 to 2000. While plaintiffs are correct that an "individual Class member's specific head impacts and symptoms will have no bearing on whether playing NCAA collegiate football, in general, can cause TES and CTE," [155] at 29, plaintiffs' proposed question still asks for an answer over time and plaintiffs do not suggest that they will have common evidence across the decades that will answer this question.

16

Plaintiffs' issues about the NCAA's knowledge as of 1958 may also be independent of any individual class member's experience, but the relative importance of that issue to the ultimate merits of any player's negligence claim is doubtful, as discussed below when considering superiority.

Perhaps plaintiffs' proposal would not raise the risk of many subsidiary questions and would be more amenable to resolution via a common set of evidence if plaintiffs had sought to certify a single sport/single school class limited to "a narrow time period during which substantially similar concussion-related practices and policies were consistently applied" as Judge Lee envisioned. *See In re NCAA*, 314 F.R.D. at 597, 605. Instead, plaintiffs seek to certify a class period over half a century long. "While there may be cases where a group of putative class members are sufficiently homogenous over an extended period of time to permit class certification across decades, this is not one of them." *See Millman v. United Techs. Corp.*, No. 1:16-CV-312-HAB, 2019 WL 6112559, at *7 (N.D. Ind. Nov. 18, 2019) ("When a class period encompasses more than thirty years, there are simply going to be too many disparities between the proposed class members … for class treatment to be appropriate."). Considering the temporal breadth of plaintiffs' proposed class period, the answers to plaintiffs' proposed issues cannot be derived from common evidence.

The NCAA also argues that the proposed classes face an insurmountable standing problem. [162] at 21. The Constitution limits federal-court jurisdiction to controversies brought by plaintiffs who "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Plaintiffs' proposed classes include all participants in the football programs of the four member institutions in the sample cases. Plaintiffs argue that all proposed class members played college football and sustained more head impacts than they should have during practices or games because of the NCAA's breach of its duty to protect student-athlete health and safety. [163] at 8. According to plaintiffs, "[t]hat alone is a concrete injury, even if a player has not yet developed symptoms associated with the neurodegenerative diseases those head impacts tend to cause." *Id.* Playing college football, the theory goes, is like being exposed to a toxic substance. *Id.* at 8–9.

Allegations of future harm can establish Article III standing if that harm is "certainly impending," but "allegations of possible future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[T]he mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a separate concrete harm." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 436 (2021).

The sample case plaintiffs have alleged that they are currently experiencing health problems due to head impacts and concussions incurred during their time playing NCAA football. *See* [98] ¶¶ 80–83; 16-cv-9980, [1] ¶ 84; 17-cv-4975, [1] ¶ 77; 17-cv-1402, [1] ¶¶ 81, 90. But there is no evidence that every participant in these college football programs from 1958 to 2010 suffered concussions, concussion-related injuries, or long-lasting effects and injury sufficient to warrant money damages. And

the risk of developing a neurodegenerative disease alone is not a concrete harm. *See, e.g., Mehr v. Féderation Internationale de Football Association,* 115 F.Supp.3d 1035, 1057–58 (N.D. Cal. 2015) (finding no Article III injury where plaintiffs' alleged that they had an "increased risk of latent brain injuries" due to "repeated head impacts" during their time playing soccer); *Archie v. Pop Warner Little Scholars, Inc.,* No. 16-cv-6603, 2017 WL 11628813, at *8 (C.D. Cal. Oct. 20, 2017) (finding no injury where plaintiffs alleged "that head trauma occurred years ago while playing youth football … not … that those incidents led to actual brain injury that in turn could lead to disease or CTE" and "alleged no facts to establish that chronic brain injury, disease, or CTE is 'certainly impending.'"). While these non-injured individuals would be considered part of the classes, they would not have Article III standing.

The NCAA is correct that every class member must have Article III standing and plaintiffs bear the burden of demonstrating that they have standing. *See TransUnion,* 594 U.S. at 430–31. But the determination of an absent class member's standing does not need to occur before class certification. *See Kohen v. Pac. Inv. Mgmt. Co.,* 571 F.3d 672, 676 (7th Cir. 2009); *Bell v. PNC Bank Nat. Ass'n,* 800 F.3d 360, 380 (7th Cir. 2015) ("A class will often include persons who have not been injured by the defendant's conduct, but this possibility or, indeed inevitability, does not preclude class certification."). Requiring every class member to prove their injury now would be "putting the cart before the horse" and "would vitiate the economies of class action procedure." *Kohen,* 571 F.3d at 676.

That said, "at some point before it can award *any* relief, the district court will have to determine whether each member of the class has standing." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019) (emphasis in original). Determining standing is an individualized issue as each "member[] of [the] proposed class will need to present evidence that varies from member to member" to show Article III injury. *See id.* at 1274–75 (quoting *Tyson Foods, Inc.*, 577 U.S. at 453). While it is unclear at this stage what portion of the proposed class would not have standing, the individualized questions of standing will predominate over the common issues in the case. Plaintiffs' proposal envisions a resolution of issues but no award of relief in this court. If this court did not identify which class members have Article III standing, its resolution of an issue would be an advisory opinion. Before answering the proposed questions in this court, the class would have to be narrowed to only people with Article III standing. Such an undertaking eliminates any predominance of plaintiffs' proposed common issues.

### 2. *Rule 23(b)(3) Superiority*

Even if plaintiffs could satisfy the predominance requirement for one or more of their issues, a class action must also be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority draws heightened attention because of the looser predominance test applied by many courts looking at Rule 23(c)(4) issues classes. *McLaughlin on Class Actions* § 4:43 (20th ed.) (citing *Haley v. Tchrs. Ins. & Annuity Ass'n of Am.*, 54 F.4th 115, 123 n.43 (2d Cir. 2022); *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 412–13 (6th Cir. 2018) ("Superiority … functions as a backstop against

20

inefficient use of Rule 23(c)(4).")). In determining superiority, courts consider the following factors: (A) the class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

None of the factors to determine superiority suggest that class treatment here would be a superior method of litigating the proposed issues over individual litigation. Plaintiffs admit that "the potential recovery in the individual cases [here] is high," [155] at 30, unlike many proposed class actions where the claims are too low-value to support individual actions. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Relatedly, there are other cases pending in state court alleging similar claims. *See* [162-5] (listing the status of 83 individual lawsuits). There is a risk of inconsistent rulings, and a risk that issue certification here will infringe upon putative class members' control over their own litigation. *See Newberg and Rubenstein on Class Actions* § 4:69 (6th ed.) (explaining individual interests are strong when claims are larger or when plaintiffs have an emotional connection to the litigation); *Amchem*, 521 U.S. at 616 ("Each plaintiff in an action involving claims for personal injury and death has a significant interest in individually controlling the prosecution of his case."). Plaintiffs also provide no support for the desirability of concentrating these

issues in this district (or the districts the cases were originally filed in).[5] *See Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (finding superiority not met in part because plaintiff offered "no adequate justification for the concentration of the litigation in this particular forum."). Of course, coordinating the cases made sense from the perspective of multidistrict litigation, but plaintiffs do not suggest how Rule 23(b)(3)(C) would apply.

The largest hurdle plaintiffs face is the manageability of class-wide resolution of their proposed issues. Class-wide issue certification will not lessen the time, effort, or expense of this litigation. Plaintiffs argue that their proposed issues have been "some of the most important and most time-intensive issues to resolve" in the parallel state court actions. [163] at 17–18; [155] at 16–18. Conceivably, resolving the proposed issues once would obviate the need to resolve them thousands of times over. But plaintiffs' proposal does not consider that class-wide resolution of these issues across a 52-year class period will still take extensive effort and will present manageability concerns that would not arise in individual litigation. Answering plaintiffs' proposed issues will likely require narrower inquiries into evidence tied to when different class members played football, and some of the issues might be simpler to answer if confined to a few players who played at the same time. Under plaintiffs' proposal, the court will have to determine and divide the 52-year period

---

[5] The prohibition on MDL transferee courts from transferring a case to itself for trial under 28 U.S.C. § 1404(a) may also pose a barrier to this court hearing an issues trial. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).

into subclass periods during which concussion-related practices and policies were consistently applied. This would "nullify whatever efficiency would be gained by certification." *See In re NCAA*, 314 F.R.D. at 598 n. 20 (rejecting proposal to address state law variations in duty of care and foreseeability through subclasses).

Ultimately, resolution of the proposed issues will not materially advance the litigation. Plaintiffs argue that if the proposed issues are answered in the negative, *i.e.*, there is no duty, knowledge, or general causation, the NCAA can file a motion for summary judgment to extinguish the class's negligence claims. [155] at 32. If duty, knowledge, or general causation are found, plaintiffs would move on to individual trials. [155] at 31–32.

While I agree that negative answers to the proposed issues would extinguish plaintiffs' negligence claims, I am not convinced that a court certifying classes for issues only would have any authority to enter class-wide judgment on liability. The NCAA may gain some judicial declaration of an issue to estop individual class members, but the application of that issue to extinguish class members' claims would have to occur in hundreds or thousands of individual actions.[6] Plaintiffs' plan would mean judgment (the resolution of relief) would be outside this court's class-wide authority.

---

[6] Plaintiffs also propose that the class-wide issue determinations in the four sample cases be applied to the non-sample cases through an omnibus motion for class certification and summary judgment. [155] at 31. But this process would raise preclusion concerns, choice of law questions, and a similar need to define subclass periods within each putative class.

And I do not agree that an affirmative answer will advance the litigation. Instead, if the Phase I fact finder finds that the NCAA had a duty, that football can cause TES and CTE, and that the NCAA knew this, too many individual issues would remain for resolution. Plaintiffs' proposal would leave a host of complex questions relating to liability, causation, and damages to be adjudicated in thousands of subsequent Phase II individual proceedings before multiple courts and juries across the country.[7] These individualized issues would be most of the litigation.

Plaintiffs argue that the number of issues to be determined at each phase says very little about whether resolution of the proposed issues will materially advance the litigation. [163] at 17. But this imbalance does factor into whether class-wide resolution is superior to individual resolution. *See Clark v. Experian Info. Sols., Inc.*, 256 F.App'x 818, 822 (7th Cir. 2007) ("Because of the need for individualized findings in such a large class, little efficiency would be gained by certifying a class for only particular issues."). Considering how little the proposed issues will resolve, it is not appropriate under Rule 23(b)(3) to say that resolving the proposed issues on a class-wide basis is superior.

Plaintiffs may still pursue their damages claims individually, and NCAA student-athletes are also not without class-wide recourse as beneficiaries in the

---

[7] Determination of these individual questions in Phase II may also violate the Seventh Amendment, if a fact finder could reexamine an issue that an earlier jury already determined. *See Rhone-Poulenc*, 51 F.3d at 1302–03. Whether plaintiffs' proposal would implicate the Seventh Amendment would require further exploration before class certification, and I don't reach that thorny question here.

Medical Monitoring Settlement.[8] The chief objection to that settlement lamented its failure to achieve class-wide compensation for past damages. At the time of the settlement, the court thought that goal was outside class members' reach but should be explored. Plaintiffs have now explored the option and have chosen not to pursue it. Certifying and litigating class-wide issues is a creative alternative, but one that is foreclosed by the settlement and would not comport with Rule 23.

## III.  Conclusion

Plaintiffs' motion to proceed with Rule 23(c)(4) issue certification is denied.[9]

ENTER:

Manish S. Shah
United States District Judge

Date:  March 22, 2024

---

[8] The Medical Monitoring Program started in February 2020. 13-cv-9116, [585] ¶ 2. The NCAA will fund it with $70 million. 13-cv-9116, [266-1] at 23–24. Its Medical Science Committee has four doctors that meet annually to ensure that the program meets current standards of care. 13-cv-9116, [626] ¶¶ 2–4. Multiple doctors are available to class members in nationwide locations. 13-cv-9116, [266-1] at 28. The program is achieving its intended goal to provide all current and former NCAA student-athletes with screening, medical care, and increased concussion management protections.

[9] The NCAA's motion to compel the sample-case plaintiffs to respond to discovery requests is denied as moot.